UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| STEVE MCDONALD, <br><br> Plaintiff, <br><br> v. <br><br> NEXUS COGNITIVE TECHNOLOGIES, LLC, <br> , <br> AND <br><br> INSIGHT VENTURE MANAGEMENT LLC <br><br> Defendants. | Case No. 1:25-cv-08569-JMF |

## SECOND AMENDED COMPLAINT

Plaintiff, STEVE MCDONALD, by and through their undersigned counsel, complain of Defendants, Nexus Cognitive Technologies, LLC and INSIGHT VENTURE MANAGEMENT LLC. (collectively "Defendants"), as follows:

## NATURE OF THE CASE

1. This is a civil rights and employment action brought to recover damages for discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et* seq. ("Title VII), New York State Human Rights Law ("NYSHRL"), N.Y. Executive Law § 290 *et seq.*, and New York City Human Rights Law (NYCHRL), N.Y.C. Admin Code § 8-107(1)(a)(3), and New York's whistleblower statute, NY Labor Law §740.

2. Plaintiff seeks to redress for unlawful employment discrimination on the basis of sex, sexual harassment, hostile work environment, and reprisal for complaining of sexual harassment and refusing to participate in conduct he reasonably believed to be unlawful and unethical

1

(solicitation of prostitution and misuse of corporate resources.)

## JURISDICTION AND VENUE

2. This Court has diversity jurisdiction pursuant to 28 U.S. Code § 1332.

3. Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) because a substantial portion of the events or omissions giving rise to this action occurred in this District, and Defendant INSIGHT VENTURE MANAGEMENT LLC. conducts business and maintains offices in this District.

4. Plaintiff exhausted his administrative remedies

## PARTIES

5. Plaintiff resides at 48 Lawrence Avenue, Milford, Connecticut and is a citizen of that State.

6. At all relevant times, Plaintiff was employed by Defendant Nexus Cognitive Technologies, LLC (Defendant "Nexus") as Vice President of Business Partner Development from approximately August 26, 2024 until his termination on February 19, 2025.

7. Defendant Nexus is an "employer" within the meaning of New York laws.

8. Upon information and belief, Defendant Nexus is a Delaware limited liability company that maintains a principal place of business in the State of Texas, at 15455 Dallas Parkway, Suite 600, Addison, Texas.

9. Upon information and belief, Defendant Insight Venture Management LLC (Defendant "Insight") is a private equity firm that maintains a Headquarter and a principal place of business at 1114 Avenue of the Americas, 36th Floor, New York, New York, and is registered to do business in the State of New York.

10. Insight exercised control over the employment of Nexus, including hiring, firing and employee misconduct investigations

11. None of the members of Defendants Nexus and Insight is a citizen of Connecticut.

12. The suspected members known to Plaintiff are citizens of the following States:

    a)   Robert J. Nolan is believed to be member of Defendant Insight and is a citizen of the State of New York;

    b)   Jeff Horing is believed to be member of Defendant Insight and is a citizen of the State of New York;

    c)   Anu Jain is a member of Defendant Nexus and is a citizen of the State of Georgia;

    d)   Steven Roberts is a member of Defendant Nexus and is a citizen of the State of Texas;

    e)   Andy Nardo is a member of Defendant Nexus and is a citizen of the State of Texas; and

    f)   Plaintiff believes and thus avers that any and all other members of Defendants Nexus and Insight are not citizens of Connecticut.

13. Based upon the foregoing, there is complete diversity pursuant to 28 U.S. Code § 1332.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

14. Plaintiff exhausted his administrative remedies pursuant to Title VII and NYHRA.

15. On August 19, 2025, Plaintiff timely filed a formal complaint with the U.S. Equal Employment Opportunity Commission ("EEOC"). Plaintiff subsequently requested issuance of a notice of right to sue (the "Notice").

16. The EEOC issued a Notice on August 29, 2025. Plaintiff files this lawsuit within 90 calendar days of her receipt of the Notice.

## FACTUAL ALLEGATIONS

**On August 26, 2024, Plaintiff started working for the Company.**

17. On August 26, 2024, the Company hired Plaintiff as Vice President of Business Partner Development. Plaintiff received an offer letter from Nexus, which included Insight. Insight led the hiring process and conducted the compensation discussions with Plaintiff.

18. Although Plaintiffs direct supervisor was John Hoffman, Chief Revenue Officer, Plaintiff also regularly interacted with Chief Executive Officer ("CEO") Anu Jain, from whom he received direction and guidance. While not formally reporting to Mr. Jain, Plaintiff engaged with him as if he were a second-line supervisor.

19. Initially, Plaintiff interacted frequently with CEO Jain and received substantial input and direction from him regarding strategic initiatives and partner development.

20. On Plaintiffs first day of work, August 26, 2024, he attended a "Sales Bootcamp" meeting at the Bellyard Hotel in Atlanta, Georgia.

21. During the Sales Bootcamp meeting, CEO Jain told Plaintiff he was impressed by his skills and enthusiasm and invited him to join Nexus' Executive Leadership Team ("ELT"), an offer Plaintiff accepted.

**CEO Jain Invited Plaintiff to Various Business Events as a Member of the Executive Leadership Team.**

22. On August 28, 2024, Plaintiff received a Microsoft Teams invitation to the EL T, which included, CEO Jain as well as CRO Hoffman, Vice President of Human Resources Kim Borders, interim CFO Jeff Daly, CTO Andy Nardo, Nexus Partner Steve Roberts, and Chief of Staff Barrett Johnson.

23. On the evening of August 28, 2024, after a staff dinner concluded, Plaintiff met with CEO Jain in the Bellyard Hotel Lobby. Plaintiff expressed enthusiasm for working at the Company and expressed gratitude for the opportunity to join Nexus' ELT.

24. During Plaintiffs conversation with CEO Jain, a young woman approached CEO Jain as he walked away from Plaintiff and said, "that's my birthday boy," referring to CEO Jain.

25. In or around mid-September 2024, CEO Jain invited Plaintiff to attend an ELT meeting scheduled for September 25, 2024, in Atlanta, Georgia and extended Plaintiff an invitation to his son's orchestra concert on the evening of September 24, 2024.

26. On September 24, 2024, CEO Jain offered to give Plaintiff a ride to the venue. During the car ride, CEO Jain received a call *via* his vehicle's speakerphone. The car's display screen showed the caller's name as "Savannah." CEO Jain repeatedly muted the call and boasted to Plaintiff that he was dating Savannah Miles, a 23-year-old whom he referred to as "Miss Georgia." He encouraged Plaintiff to "look her up on Instagram to see how attractive she is."

27. During the car ride, Plaintiff heard Ms. Miles tell CEO Jain, "I'm getting presents for you, Anu," and mentioned that she had been in his apartment earlier that day, September 24, 2024.

28. CEO Jain turned to Plaintiff and explained that Ms. Miles would be joining him on his upcoming business trip to India. He further told Plaintiff that Ms. Miles and her mother clean his corporate condominium, stating that he paid "very well" for their services and implied that was not all the services he received for the money he spent.

29. From this point forward, Plaintiff felt very uncomfortable in CEO Jain's presence.

30. In the days following September 24, 2024, several Nexus employees—including Rachel O'Brien, Nexus' Marketing Manager—informed Plaintiff that CEO Jain was using an online "sugar daddy" service, through which he provided financial support in exchange for personal or romantic relationships. They specifically mentioned that Ms. Miles was one of the women he supported through this arrangement and referred to her as one of his "girlfriends."

31. On August 27, 2024, during the second day of the second day of the Sales Bootcamp meeting,

5

Plaintiff attended a team dinner and sat alongside CEO Jain. During the dinner, Jain and Plaintiff discussed Nexus strategic importance regarding one of their largest partners.

32. Plaintiff mentioned that he had a strong professional relationship an executive with one of the largest partners.

33. To Plaintiff's surprise, CEO Jain became enraged by Plaintiff's comment and whispered: "I hate that fucking guy. I would like to shove my dick down his throat so hard that he'd choke."

**CEO Jain Invited Plaintiff to Solicit Prostitutes in New York.**

34. On November 12, 2024, Plaintiff attended a business event hosted by Nexus' largest partner, Insight, as a member of Nexus Leadership.

35. That evening, Plaintiff walked CEO Jain to his hotel, the St. Regis Hotel, as they continued their business discussion about the Nexus' partners strategies and agreed to meet the next morning, November 13, 2024, to continue their discussion.

36. CEO Jain then invited Plaintiff to join him for a drink at the St. Regis Hotel bar. Plaintiff declined his invitation, noting that he needed to take a long train home and that he would be coming back to New York the next morning to meet with him.

37. CEO Jain insisted, stating: "there are beautiful women at the bar, Steve," Plaintiff declined again and became very uncomfortable.

38. Seemingly dissatisfied with Plaintiff's response, CEO Jain responded that "they are professionals," referring to the women at the bar. Plaintiff nervously laughed and made a comment in jest about the cost of prostitution in such an expensive hotel being beyond Plaintiff's cash withdrawal limit. Plaintiff responded by saying that it was "not Plaintiff's thing," and declined.

39. CEO Jain persisted, stating "it's more affordable than you would guess," and then added

6

something to the effect of: "I just say that $1000 is all I offer and for that I get everything."

40. Plaintiff responded: "That's not my thing," and tried to make small talk to deflect away from having to say yes or no to the invitation. Plaintiff added: "I will come back to the city in the morning, and we can work on the partner strategy."

### CEO Jain Removed Plaintiff from the Executive Leadership Team.

41. The following day, November 13, 2024, Plaintiff called CEO Jain to follow up on the planned meeting regarding partner strategy. To his surprise, CEO Jain informed Plaintiff that he was leaving New York to return home. Plaintiff asked about the executive happy hour scheduled that evening with Insight, and CEO Jain said he would not be attending.

42. Plaintiff offered to attend the event in his place, given his role on the Executive Leadership Team. CEO Jain declined, stating that it would be "too much work to call Insight and switch names," and instructed Plaintiff to go home instead.

43. Plaintiff found this response unusual and concerning, especially given his responsibilities as Vice President of Business Partner Development. CEO Jain's unwillingness to let Plaintiff represent Nexus with a major partner marked a noticeable shift in CEO Jain's behavior.

44. Around November 20, 2024, Plaintiff was removed from all weekly Nexus Leadership meetings and lost access to the Executive Leadership Team workspace in Microsoft Teams. When Plaintiff followed up with his direct supervisor, Mr. Hoffman, Mr. Hoffman confirmed that CEO Jain had removed Plaintiff from the Nexus Leadership Team.

### CEO Jain's Attitude Towards Plaintiff Changed.

45. By late November 2024, Plaintiff began noticing a continued shift in how CEO Jain treated him and in his day-to-day work duties.

7

46. CEO Jain did not express any criticism of Plaintiff's work performance. In fact, under Plaintiff's leadership, the partner network was expanding, the partnership with one of their biggest partners was thriving, and the sales opportunity pipeline through partners was growing. Nexus partnerships had become the leading source of new sales opportunities for the company. Nevertheless, Mr. Jain's demeanor toward Plaintiff became increasingly hostile

47. Beginning in or around December 2024, CEO Jain began excluding Plaintiff—then serving as Vice President of Business Partner Development—from key discussions and meetings with existing and potential partners, including Insight.

48. Rather than addressing questions directly to Plaintiff as he had done previously, CEO Jain began communicating more frequently with Plaintiff's direct reports, bypassing Plaintiff in the process.

49. When CEO Jain did speak directly with Plaintiff, his tone was often irritated, and he frequently shifted the conversation away from the originally stated agenda, creating confusion and tension.

50. Around December 2024, Mr. Jain began sending Plaintiff a series of unusually lengthy and burdensome requests for "memos" detailing everything Plaintiff knew about existing and target partner companies. These requests, which began arriving via email the week before Christmas, included exhaustive and often impractical questions. Many were vague or overly broad—such as "How does Amazon make decisions?"—and appeared designed to expose gaps in Plaintiff's knowledge rather than to gather actionable information. Plaintiff sought guidance from Hoffman, who advised focusing on relevant and useful insights. However, Mr. Jain's requests remained rigidly specific, making it difficult to respond without appearing uncooperative or uninformed.

51. These memo requests were not only excessive in length and scope but also included demands for information that were unreasonable for Plaintiff to possess, further contributing to a hostile and untenable work environment.

52. This increasingly hostile environment intimidated Plaintiff to the extent that, on January 3, 2025, he felt unable to request necessary leave to care for his ailing mother, fearing that doing so would result in termination.

**CEO Jain Retaliated Against Plaintiff for Reporting His Sexual Harassment to HR.**

53. In or around early February 2025, Plaintiff spoke with Andy Nardo, Nexus co-founder and Partner. Mr. Nardo expressed concern about CEO Jain's treatment of Plaintiff and shared that he had contacted Mr. Jain after a meeting to discuss his hostile behavior.

54. On February 4, 2025, Plaintiff had a phone call with Nexus' Vice President of Human Resources, Kim Borders, outlining the sexual harassment, hostile work environment, and misuse of Company resources Plaintiff had experienced.

55. Upon information and belief, On February 5, 2025, Ms. Borders forwarded a comprehensive report—including Plaintiff's complaint and those of other employees—regarding CEO Jain's sexually hostile, retaliatory and harassing misconduct to Insight attorneys, Jill Grant, Rose Ohanesian, Aziz Ziyad, and Thomas Spencer. Ms. Grant confirmed receipt and advised that the matter had been shared with Nexus' Board of Directors. She stated that a Board member would be reaching out to certain employees.

56. Upon information and belief, on February 7 and 10, 2025, Richard Matus, a Nexus Board Member and Principal at Insight Partners, contacted Mr. Hoffman and Ms. Borders regarding an investigation into CEO Jain's conduct.

57. Also, upon information and belief, around February 10, 2025, CEO Jain became visibly

distressed and began calling Lou Martinez multiple times in an effort to "dig up information" on employees he believed were not performing—or who had reported him to the Board. Jain specifically inquired about Plaintiff, Mr. Hoffman, Mr. Nardo, Ms. Borders, Bob Griffin, and Senior Sales Associates Paul Falkenberg.

58. From February 9 to 13, 2025, Plaintiff attended a four-day conference with one of Nexus' largest partners, alongside Mr. Hoffman, Mr. Falkenberg and Shawn Burns, Sales Representative, and CEO Jain.

59. Throughout the conference, CEO Jain appeared upset and withdrawn. He made no effort to engage with Plaintiff and scheduled a leadership meeting with one of their largest partners that excluded Plaintiff entirely.

60. Upon information and belief, on February 11, 2025, CEO Jain told Mr. Falkenberg that he was under investigation and that "a coup at Nexus" was underway. He stated he intended to "cut the head off the snake," and identified Plaintiff, Mr. Hoffman, and Ms. Borders as individuals he planned to terminate.

**Defendants Terminated Plaintiff's Employment on February 19, 2025**

61. On February 19, 2025, CEO Jain sent Plaintiff a last-minute virtual meeting invitation. CEO Jain did not attend. Instead, his personal attorney, Chris Quinlan, and the Company's Human Resources Recruiter, Chantal Kane-Krebs, attended. During a brief ten-minute meeting, they informed Plaintiff that his position was being eliminated, effective immediately and that the Company was offering a two-week severance. Plaintiff had exchanged emails with Mr. Quinlan but had never met him or Ms. Kane-Krebs before this meeting.

62. Later that day, I learned that the Company had terminated other employees under similar circumstances, including but not limited to: Mr. Hoffman, Ms. Borders, and Barrett Johnson,

Muneera Zaineldeen, and David Brady, Sales Representative.

## CLAIMS FOR RELIEF

### Count I – Sexual Harassment and Hostile Work Environment
(Title VII, NYSHRL, NYCHRL)

63. Plaintiff repeats and realleges Paragraphs 1–62, as if fully set forth herein

64. Plaintiff was subjected to unwelcome sexual solicitation by a supervisor, creating a hostile work environment.

65. Defendants knew or should have known of the conduct and failed to take appropriate remedial action.

66. This conduct violates NYSHRL and NYCHRL.

67. Defendants' actions were intentional, reckless, and malicious.

68. As a result, Plaintiff incurred damages, including lost wages, pain and suffering, emotional distress, mental anguish, and/or punitive damage.

69.

### Count II – Retaliation for Reporting Sexual Harassment and Unlawful Conduct
(Title VII, NYSHRL, NYCHRL, and NY whistleblower statute)

70. Plaintiff repeats and realleges Paragraphs 1–5, 68 as if fully set forth herein

71. Plaintiff engaged in protected activity by reporting sexual harassment and opposing unlawful conduct.

72. Plaintiff was terminated in retaliation for this protected activity.

73. This retaliation violates NYSHRL, NYCHRL, and NY whistleblower statute.

74. Defendants' actions were intentional, reckless, and malicious.

75. As a result, Plaintiff incurred damages, including lost wages, pain and suffering, emotional

distress, mental anguish, and/or punitive damage.

### Count III – Retaliation for Opposing Unlawful conduct
(NYSHRL, NYCHRL, and NY whistleblower statute)

76. Plaintiff repeats and realleges Paragraphs 1–74 as if fully set forth herein

77. Plaintiff was terminated for refusing to participate in solicitation of prostitution and misuse of corporate funds—both illegal under New York laws.

78. Termination on this basis constitutes wrongful discharge under NYSHRL, NYCHRL, and NY whistleblower statute.

79. Defendants' actions were intentional, reckless, and malicious.

80. As a result, Plaintiff incurred damages, including lost wages, pain and suffering, emotional distress, mental anguish, and/or punitive damage.

### DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury on all Counts so triable.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff requests that the Court enter judgment against Defendants on all Counts, and award Plaintiff lost wages and benefits, liquidated damages, compensatory damages, pre- and post-judgment interest, an amount equal to the tax on any award, attorney's fees, litigation

costs, and any other relief as is just and proper.

Dated: March 11, 2026                              Respectfully submitted,

                                                        Samuel A. Dion, Esq.
Dion & Goldberger
2001 Market Street, Suite 2500
Philadelphia, PA 19103
800.346.6726
samueldion@aol.com

Alan Lescht, Esq.
Sara McDonough, Esq.
Tiba Fatli, Esq.
Alan Lescht and Associates, PC
1825 K St NW #750
Washington, DC 20006
202.463.6036
alan.lescht@leschtlaw.com
sara.mcdonough@leschtlaw.com
tiba.fatli@leschtlaw.com

*Counsel for Plaintiff*